**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

================================

**AUCTUS FUND, LLC,**

**Plaintiff,**

**v.** : **Civil Action No. __________________**

**OPTEC INTERNATIONAL, INC.,**

**Defendant.**

================================

## COMPLAINT AND DEMAND FOR JURY TRIAL

## I. INTRODUCTION

1. The Plaintiff, Auctus Fund, LLC, (hereinafter "Auctus" or the "Fund"), respectfully submits its Complaint and Demand for Jury Trial (hereinafter the "Complaint") against the Defendant, Optec International, Inc., (hereinafter the "Company" or "OPTI"), in the above-captioned action. The Plaintiff's allegations, as set out herein, are asserted for such damages arising from, and resulting from, the Defendant's violations of the following:

a) Sections 12(2) and/or 17(a) of the Securities Act of 1933, *as amended* (hereinafter the "Securities Act" or the "1933 Act"), 15 U.S.C. §§77l(2) and/or 77q(a), Section 10(b) of the Securities Exchange Act of 1934, *as amended* (hereinafter the "Exchange Act" or the "1934 Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5;

b) Massachusetts Uniform Securities Act, M.G.L. c.110A, §§ 101, *et seq.*, *as amended* (hereinafter the "Uniform Securities Act");

c) breach of contract;

d) breach of implied covenant of good faith and fair dealing;

e) unjust enrichment;

f) breaches of fiduciary duty;

g) fraud and deceit;

h) negligent misrepresentation; and/or

i) the Massachusetts Consumer Protection Act, M.G.L. c. 93A, §§ 2 and 11.

2. The Plaintiff further alleges that, as a result and as caused by the Defendant's breaches, actions, omissions, policies, practices, and/or courses of conduct, Auctus has suffered irreparable harm, requiring injunctive relief and specific performance, harm to its business and reputation in the investment industry, damages from the Defendant's coercion, duress, and unfair and deceptive anti-competitive acts, causing lost revenue, lost profits and prospective business, together with its injuries and damages.

3. The Plaintiff respectfully requests that its causes of action against the Defendant proceed to a trial by jury, that a judgment be entered on all Counts against the Defendant and that Auctus be awarded its general, compensatory and consequential damages and losses, costs, interest, plus multiple and/or punitive damages, attorneys' fees, and grant, order and enter temporary, preliminary and permanent injunctive and equitable relief, and grant, order and enter declaratory relief, and any such other relief as this Honorable Court deems just and appropriate.

## II. PARTIES

4. The Plaintiff, Auctus Fund, LLC is a limited liability company, duly organized in the State of Delaware, with its principal place of business located at 545 Boylston Street, 2nd Floor, Boston, Massachusetts 02116.

5. Upon information and belief, the Defendant, Optec International, Inc., is a corporation, duly organized in the State of Nevada, with a principal place of business located at 2721 Loker Avenue West, Carlsbad, California 92010.

## III. JURISDICTION AND VENUE

6. The Plaintiff asserts that this Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and under the Securities Act, 15 U.S.C. §§ 77a, *et seq.*, and under the Exchange Act, 15 U.S.C. §§ 78a, *et seq.*

7. The Plaintiff contends that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts in that, pursuant to the Transaction Documents (defined below), the Plaintiff Auctus and Defendant OPTI agreed that any and all disputes between and/or among them shall be brought, *inter alia*, in the state or federal courts in the Commonwealth of Massachusetts. Additionally, this Court is in such District where the Plaintiff Auctus is headquartered and has its principal place of business and is where the violative conduct described herein is alleged to have occurred.

8. This Court has personal jurisdiction, generally and specifically, over the Defendant by express terms of the Agreement, and as arising from its extensive business contacts, generally over time and specifically, in its business dealings with Plaintiff Auctus within the Commonwealth of Massachusetts.

## IV. FACTUAL BACKGROUND

### A. The Auctus / OPTI Transactions Documents and Contracts

9. On or about November 17, 2017, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "First Purchase Agreement" or the "First SPA") and a certain Convertible Promissory Note (hereinafter the "First Note" and, with the First SPA

and other documents, collectively hereinafter the "First Transaction Documents"), thereby entering into a contract with Plaintiff Auctus for its securities investments in OPTI. Upon various dates, the Plaintiff successfully converted the Defendant's obligations into publicly traded shares of OPTI common stock, and, as of on or about June 14, 2018, had fully recouped its OPTI investment on the First SPA and the First Note.

10. On or about April 30, 2018, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Second Purchase Agreement" or the "Second SPA") and a certain Convertible Promissory Note (hereinafter the "Second Note" and, with the Second SPA and other documents, collectively hereinafter the "Second Transaction Documents"), thereby entering into a further contract with Plaintiff Auctus for its additional securities investments in OPTI. Upon various dates, the Plaintiff successfully converted the Defendant's obligations into publicly traded shares of OPTI common stock, and, as of on or about November 2, 2018, had fully recouped its OPTI investment on the Second SPA and the Second Note.

11. Thereafter, on or about June 15, 2018, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Third Purchase Agreement" or the "Third SPA") and a certain Convertible Promissory Note (hereinafter the "Third Note" and, with the Third SPA and other documents, collectively hereinafter the "Third Transaction Documents"), thereby entering into another contract with Plaintiff Auctus for its further investment in OPTI. *See* Third Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit A**; Third Note, attached, restated and incorporated by reference herein as **Exhibit B**.

12. On or about July 16, 2018, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Fourth Purchase Agreement" or the "Fourth SPA") and a certain Convertible Promissory Note (hereinafter the "Fourth Note" and, with the Fourth SPA and

other documents, collectively hereinafter the "Fourth Transaction Documents"), thereby entering into a further contract with Plaintiff Auctus for its additional investment in OPTI. *See* Fourth Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit C**; Fourth Note, attached, restated and incorporated by reference herein as **Exhibit D.**

13. On or about January 11, 2019, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Fifth Purchase Agreement" or the "Fifth SPA") and a certain Convertible Promissory Note (hereinafter the "Fifth Note" and, with the Fifth SPA and other documents, collectively hereinafter the "Fifth Transaction Documents" and with the Third Transaction Documents and Fourth Transaction Documents, collectively hereinafter the "Transaction Documents"), thereby entering into an additional contract with Plaintiff Auctus for its continued investment in OPTI. *See* Fifth Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit E**; Fifth Note, attached, restated and incorporated by reference herein as **Exhibit F.**

14. Thus, in detrimental reliance upon the information, representations and statements from the Defendant, the Plaintiff invested hundreds of thousands of dollars in the Company, which has, and has had, a fiduciary duty and a duty of the utmost loyalty to the Plaintiff. Unfortunately, to its detriment, the Plaintiff has learned that the Defendant had misrepresented and deceived the Fund regarding its business, operations and finances, perpetrated securities fraud in connection with the offer, purchase and sale of securities, in violation of, *inter alia*, Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5, as promulgated thereunder.

**B. Defendant's Misrepresentations and Omissions of Material Facts and Securities Fraud in Connection with Offer, Purchase and Sale of Securities**

15. The Plaintiff asserts and alleges that the Defendant misrepresented, omitted and failed to provide material facts to Auctus in connection with its investments and in the offer,

purchase and sale of securities, and especially with respect to the operations, business, finances and other matters of Defendant OPTI.

16. As an example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about July 31, 2018, the Defendant published and disseminated certain statements, entitled "*OTC Markets Group Welcomes New OTCQB Companies- July 31*," which provided, in pertinent part, as follows:

> "Optec International, Inc. (OTCQB: OPTI) OPTEC International is a publicly traded, fully reporting OTC company and worldwide provider of green technologies for continued global reduction of fossil fuel usage, pollution and greenhouse gas emissions. The Company holds the worldwide license for marketing and distribution of OPTEC Fuel Maximizer products. The OPTEC Fuel Maximizer is a patented, plug-in-play aftermarket automotive device. By improving the overall combustion process, it enables modern, combustion engines to substantially reduce unburned hydrocarbons and harmful emission while simultaneously increasing engine performance and fuel economy."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

17. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about July 31, 2018, the Defendant published and disseminated certain statements, entitled "*OPTEC International (OPTI) Announces Upgrade to OTCQB Trading Platform*," which provided, in pertinent part, as follows:

> **"CARLSBAD, CA / ACCESSWIRE / July 31, 2018 /** OPTEC International, Inc. (OTCQB: OPTI), a leading worldwide provider of green technologies, today announced the company stock has commenced trading to the upgraded OTCQB Venture Market ("OTCQB") platform.
>
> "Uplisting to the OTCQB is a significant step forward for OPTEC International," said Peter Sollenne, CEO of OPTEC International. "We are very pleased to be trading on the OTCQB as it will provide our shareholders with greater transparency and liquidity in our common stock. We believe this will instill our shareholders with even greater confidence in the information we publicly disclose each quarter."

> Mr. Sollenne continued, "Meeting the increased compliance and disclosure requirements of the OTCQB market demonstrates OPTEC's commitment to accountability and transparency. We hope that trading on this established public market will help to provide a more stable trading platform and exposure for OPTEC to additional institutional investors."
>
> The OTCQB is considered by the U.S. Securities and Exchange Commission (SEC) as an "established public market" for the purpose of determining the public market price when registering securities for resale with the SEC. The OTC Pink platform is not considered as such and most broker-dealers will not trade or recommend OTC Pink stocks
>
> Because the OTCQB dramatically increases transparency, reporting standards, management certification and compliance requirements, the majority of broker-dealers trade stocks on the OTCQB. Historically, this has resulted in improved liquidity and awareness for companies that ascend to the OTCQB tier. The OTCQB is a venture market designed for early-stage and developing US and international companies.
>
> OPTEC International has continued to make advances in becoming a worldwide provider of green technologies. Last month, the company announced the expansion of the exclusive International Distribution agreement to Worldwide Exclusive Distributor of the OPTEC Fuel Maximizer product lines. Additionally, the company also established the OPTEC™ Power Generation Division as a key part of the company's strategic expansion plans.
>
> The OPTEC™ Fuel Maximizer is a proprietary patented "plug-and-play" technology designed for use in modern, computer-controlled gasoline and diesel automobile and generator engines, which eliminates or substantially reduces harmful emission gases while simultaneously increasing performance and increasing fuel economy."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

18. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about August 28, 2018, the Defendant published and disseminated certain statements, entitled "*OPTEC International, Inc., Signs Royalty Contract for $10M Revenues Over 3 Year Period,"* which provided, in pertinent part, as follows:

> "CARLSBAD, Calif., Aug. 28, 2018 /PRNewswire/ -- **OPTEC International, Inc.,** (OTC: OPTI) today announced the Company has signed a royalty contract for revenues exceeding $10M over the next 3 years.
>
> On June 4, 2018, OPTEC International, Inc. (Hereafter the Company) acquired the Exclusive International License (excluding North America, Canada, Mexico and USA) for the OPTEC™ Fuel Maximizer product line from Optimized Fuel Technologies.

> Subsequently, on June 20, 2018, OPTEC International, Inc. additionally acquired the Exclusive North America License for the OPTEC™ Fuel Maximizer.
>
> The information was disclosed in an 8-k dated June 22, 2018.
>
> On August 8, 2018, Optimized Fuel Technologies entered into a contract with a nationwide automotive distribution company that desired to purchase the OPTEC™ Fuel Maximizer on a manufacturer direct basis. Over a 3-year period, the contract represents minimum sales in excess of forty million dollars. Whereas the Company owns the exclusive licensing rights to sales of the OPTEC™ Fuel Maximizer; per the Royalty agreement dated August 27, 2018. Although the Company's revenues will be less per the contract, its gross profit is anticipated to be higher as it will not have to be subjected to inventory, quality control, freight and staffing for distribution.
>
> On August 27th, 2018, the Company signed a Royalty Agreement with Optimized Fuel Technologies whereby certain pre-existing clients could purchase the OPTEC™ Fuel Maximizer on a manufacturer direct basis.
>
> Based on the contract, the Company anticipates royalty revenues exceeding ten million dollars($10,000,000) over the next three years being the initial 3-year period of a five-year contract.
>
> OPTEC International, Inc. is currently conducting fuel saving and emission reduction tests in several other countries around the world with potential future distributors, joint-venture partners and fleet operators."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

19. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about August 30, 2018, the Defendant published and disseminated certain statements, entitled "*Jennifer Ferreira, Company Spokesperson for OPTEC International, Inc., Discusses Recent Company and Industry News in an Exclusive New Audio Interview with SmallCapVoice.com,*" which provided, in pertinent part, as follows:

> "AUSTIN, Aug. 30, 2018 (GLOBE NEWSWIRE) -- SmallCapVoice.com, Inc. and OPTEC International, Inc., (OTC QB: OPTI) announced today that the Company is featured in a new audio interview at SmallCapVoice.com, Inc.

> The interview featuring OPTI's current news and industry trends can be heard at https://smallcapvoice.com/blog/8-27-18-smallcapvoice-interview-with-optec-international-inc-opti.
>
> Jennifer Ferreira, Company Spokesperson for OPTEC International, Inc., called in to SmallCapVoice.com, Inc. to go over the recent news and highlights for the Company here in Summer of 2018. Recently, OPTI announced the Company has signed a royalty contract for revenues exceeding $10M over the next 3 years.
>
> "Our Company has come a long way in 2018. We know that our investors want to hear from us about our current efforts and our future plans," stated Ferreira. "We enjoy the opportunity to share our story with our shareholders and the SmallCapVoice.com listening audience."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

20. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about September 27, 2018, the Defendant published and disseminated certain statements, entitled "*OPTEC International Launches Heavy Duty Trucking Division,"* which provided, in pertinent part, as follows:

> "**CARLSBAD, CA / ACCESSWIRE / September 27, 2018 / OPTEC International, Inc., (OTCQB: OPTI)** today announced the Company has launched the Fleet & Heavy-Duty Trucking Division Fuel Maximizer Technology.
>
> **OPTEC International, Inc**. the exclusive worldwide distributor of the **OPTEC** Fuel Maximizer, has now launched its Fleet and Heavy-Duty trucking division. The **OPTEC** Fuel Maximizer is an advanced hydrogen fuel cell technology that dramatically reduces emissions, enhances vehicle performance and throttle response, and maximizes mpg potential. The on-demand technology is designed for modern, computer-controlled gasoline and diesel engines and works on almost all internal combustion engines.
> Third party testing has revealed fuel savings anywhere from 5-10% for Heavy Duty Trucks, Transportation Refrigeration Units, generators, and off-road equipment. Tests have shown an average of 10-20% fuel savings for passenger vehicles depending on the year, make and model. To support performance claims and product safety, **OPTEC** has gone through rigorous third-party, controlled environment testing at California Environmental Engineering, CERT UC Riverside, Mesilla Valley Transportation Solutions, Olson-Ecologic, UL, SAE J1321 testing and has obtained a CARB Executive Order Exemption for various engines.

> The **OPTEC** Fuel Maximizer currently is 49 state legal for Heavy Duty Trucks. However, the new fleet division launch comes at an exciting time as we await pending emission testing results for a CARB Executive Order Exemption for the legal sale in California of the **OPTEC** Technology for these engines. Upon favorable results, we expect the **OPTEC** Fuel Maximizer to be available in California to all 2010-2018 Heavy Duty Trucks by the end of next month. **OPTEC** is also further testing with Mesilla Valley Transportation Solutions this month to expand our fuel savings certification to cover the Heavy-Duty Diesel Trucks.
>
> It has been important to us as a company to make research and development a priority and take the extra steps to provide the data on the **OPTEC** technology's capabilities. With tightening emission standards and a demand to save on fuel costs rising, we feel the **OPTEC** Fuel Maximizer is a solution for fleets to meet these demands."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

21. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about October 3, 2018, the Defendant published and disseminated certain statements, entitled "*OPTEC International Introduces Motorcycle Performance Technology*," which provided, in pertinent part, as follows:

> "**CARLSBAD, CA / ACCESSWIRE / October 3, 2018 /** OPTEC International, Inc.**, (OTCQB: OPTI)** today announced, after extensive testing, the Company is introducing the New **OPTEC** Motorcycle version of the Fuel Maximizer to the expanding OPTEC proprietary technology product lines. **OPTEC International, Inc**., the exclusive worldwide distributor of the **OPTEC** Fuel Maximizer, has now introduced the Motorcycle version of the Fuel Maximizer named the **OPTEC MC1**.
>
> After extensive testing the **OPTEC MC1** proved to have a significant increase in power resulting in enhanced acceleration and at the same time demonstrating an average of 10% fuel savings under normal operating conditions. The most noticeable result was the decrease in exhaust emissions which appeared to be almost odorless.
> The tests were conducted on Honda and BMW Motorcycles, representing 2 of the most popular and best-selling brands globally. The demand for emission reductions from the Motorcycle pollutions globally has been a significant problem particularly in the 3rd World communities. The release of this new version of the Fuel Maximizer paves the way to help reduce the carbon footprint and ozone layer expansion.
>
> Worldwide, there are over 200 million motorcycles in use and are the primary source of transportation in countries such as India, China, Vietnam, and Indonesia. Though motorcycles are more fuel efficient than most passenger vehicles, less stringent or non-

> existent emission standards allow them to emit up to 10 times more emissions. Motorcycles are one of the major sources of the following pollutants: particulate matter (PM), hydrocarbons (HC), carbon monoxide (CO), nitrogen oxides (NOx), and other hazardous emissions resulting from the release of burned and unburned lubrication oils. Worldwide demand for motorcycles is forecasted to expand six percent per annum to over 132 million units by the end of 2018, valued at $120 billion. According to Reports.com

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

22. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about October 30, 2018, the Defendant published and disseminated certain statements, entitled "*OPTEC International Introduces "OPTEC SHIELD" Platinum Plus Warranty For OPTEC Fuel Maximizer Products*," which provided, in pertinent part, as follows:

> "CARLSBAD, Calif., Oct. 30, 2018 /PRNewswire/ -- **OPTEC International, Inc.,** (OTCQB: OPTI) today announced the introduction of the "OPTEC SHIELD" Platinum Plus warranty assurance as an inclusive re-insurance policy for additional protection with the OPTEC Fuel Maximizer products.
>
> **OPTEC International, Inc**., the exclusive worldwide distributor of the **OPTEC** Fuel Maximizer, will now include the "OPTEC SHIELD" warranty as an inclusive component when distributing the OPTEC Fuel Maximizer Products.
>
> Optimized Fuel Technologies, the proprietary technology owner and manufacturer of the OPTEC Fuel Maximizer product line, developed the "OPTEC SHIELD" Platinum Plus re-insurance program for the additional benefit and assurance of the OPTEC Fuel Maximizer end users by adding a six-year unlimited mileage engine protection warranty. The "OPTEC SHIELD" warranty program is developed and owned by Optimized Fuel Technologies and underwritten and managed by "Portfolio Horizon," a leading reinsurance management company.
>
> OPTEC International CEO Peter Sollenne commented, "This is an extremely beneficial addition to our marketing efforts and further assurance of the company's strong desire to stand behind the OPTEC Fuel Maximizer product lines performance and reliability.""

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

23. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about November 8, 2018, the Defendant published and disseminated certain statements, entitled "*OPTEC International Signs LOI for Exclusive USA Distribution of OPTEC Zero Emissions all Electric Commercial Super-Scooters*," which provided, in pertinent part, as follows:

> "**OPTEC International, Inc., (OTCQB: OPTI)** today announced, the company signed an exclusive USAdistribution agreement with Optimized Fuel Technologies for their new 2019 All Electric Zero Emissions Commercial Electric Super-Scooter Models.
> **OPTEC International, Inc**., the exclusive worldwide distributor of the **OPTEC** Fuel Maximizer, will now include the **OPTEC** Super-Scooters to their exclusive USA distribution agreements.
>
> The Super Scooter patented technology was recently acquired by Optimized Fuel Technologies and is currently in production at the company's Carlsbad, CA facility. The "Cadillac" of scooters has been purchased by southern California Law Enforcement and EMT divisions and rigorously tested and proven for over 4 years. The Super Scooter has a 40 Mile Range and 30 MPH capability on a single battery and facilitates 2 batteries on board giving double the range capability. The definitive agreement is expected to be completed by the end of November 2018.
>
> This tremendous growth projection of the Electric Scooter Transportation sector has not gone unnoticed by one of the largest transportation network companies and holding companies. According to Bloomberg, Uber and Alphabet, Inc has invested $335 million into partnering with Lime, an electric scooter company. Lyft has also launched an electric scooter share program and has been one of five companies to apply for a permit in San Francisco to run an electric scooter service.
>
> In Los Angeles, San Francisco and Sacramento the frequent and rapidly expanding use of the electric scooters is reported to have a noticeable impact on vehicle traffic congestion and at the same time helping reduce the global vehicular emissions reduction."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

24. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about December 6, 2018, the Defendant published and

disseminated certain statements, entitled "*OPTEC International Rated Speculative BUY with $5.50 PPS Target by Goldman Small Cap Research*," which provided, in pertinent part, as follows:

> "OPTEC International, Inc. (OTCQB: OPTI) today announced that Goldman Small Cap Research issued a new research report on the Company. The report discusses recently announced events, financial forecasts and a $5.50 price target for its shares. To view the update report, along with disclosures and disclaimers visit. http://www.Goldman Research.com.
>
> **Goldman Small Cap Research Report Highlights**
> In the Opportunity Research update, analyst Rob Goldman discusses OPTEC's recent events and exciting upcoming opportunities that lie ahead.
>
> Goldman noted, "Via an exclusive worldwide license, OPTEC offers such an innovative, high performance, emission-reducing product that it may not even have a direct peer. Emissions can be reduced by as much as 90% yet performance increased by as much as 25%. The aftermarket product industry, in which OPTEC participates, is slated to grow to over $847B in 2022. Products offered target the passenger, commercial, fleet, motorcycle, and electric scooter markets.
>
> "A recent royalty agreement should generate more than $10M in top-line over the next 3 years. OPTEC has just entered the commercialization phase and is in the best position in company history. A combination of royalty and product sales could result in $4M and $14M in revenue for 2019 and 2020, respectively. Since royalty revenue has little to no COGS, operating profit could reach $5M in 2020."
>
> "Our target price is $5.50 and it could prove to be conservative. Our price target represents a $98Mmarket cap, or 7x projected our 2020E top-line forecast. Assigning a 20x P/E multiple on just $5Maffirms this target. Furthermore, it should be noted that the stock generally had a base of around $5 in recent months, prior to price declines and has supported prices of over $10 in the past 12 months---before OPTI's current business development successes," concluded Goldman."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

25. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about January 2, 2019, the Defendant published and disseminated certain statements, entitled "*OPTEC International Signs Exclusive North America*

*Distribution Agreement for "Pro-Sun" Horticultural LED Grow Lamps as Congress Passes Billion Dollar Farm Bill*," which provided, in pertinent part, as follows:

> "CARLSBAD, Calif., Jan. 2, 2019 /PRNewswire/ -- **OPTEC International, Inc., (OTCQB: OPTI)** today announced the company signed the exclusive North American distribution rights agreement for the "Pro-Sun" LED Horticultural Grow Lamps in a timely procedure as Congress signs the Multi-Billion Dollar "Farm Bill".
>
> The Pro-Sun Horticultural Grow Lamp is one of the world's most efficient commercial LED lighting solutions available to legal marijuana growers in North America. The Pro-Sun lighting system offers one of the few passively cooled LED lighting solutions to Marijuana growers worldwide. The Pro-Sun Passive cooling system reduces the power use for growers in excess of 30% compared to traditional HPS and Metal Halide bulbs and more recently conventional fan cooled LED Grow light systems.
>
> The Pro-Sun LED has a series of proprietary diffusion lenses which simulate natural daylight and rapidly enhances the grow cycle in a unique series of lighting sequences, which also reduces the grow time for the plants by not requiring rotation of the plant during the first grow cycle, which with regular HPS or LED lighting systems requires almost two weeks for the plant to re-acclimate after the rotation. The Pro-Sun has demonstrated grow time reduction for the plant to reach full maturity of over two weeks per crop cycle in addition to a noticeable increase in the plants yield.
>
> In 2017 the legal sale of marijuana had a revenue of $5.8 billion-$6.6 billion and is expected to grow over 200% by 2022. This extreme sales growth, commonly known as the "green rush", has brought an intense focus on large-scale cannabis farms. In the United States, cultivation licenses have become one of the most sought after and competitive applications as growers want to take advantage of this growth opportunity.
>
> Some cannabis cultivation operations are capable of yielding more than 50,000 pounds of flower. Currently Colorado, one of the leaders in the "green rush" has over 1,400 licensed cultivators. Colorado's great success has paved the way for other states to come forward.
>
> In Mendocino County California, over 850 applications for a cultivation licenses were received by March of 2018. Indoor growing of cannabis has become the most popular and sustainable method. As fierce competition grows, LED lights have become more popular among growers as a way of reducing cost. This is not just only for cannabis, but the entire horticulture industry.
>
> OPTEC International announced the first shipment of the Pro-Sun LED Grow Lamps will be delivered to the Carlsbad facility this week for distribution in January 2019."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

26. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about February 11, 2019, the Defendant published and disseminated certain statements, entitled "*Optec International Introduces 2019 Electric Zero Emissions All Terrain Tri-Wheel Rapid Response Scooters, For EMT First Responders & Law Enforcement Agenies*," which provided, in pertinent part, as follows:

> "CARLSBAD, Calif., Feb. 11, 2019 /PRNewswire/ -- **OPTEC International, Inc.,** (OTCQB: OPTI) today announced, the company launched production models of the 2019 All-Terrain Tri-Wheel OPTEC ZUUMER EMT & Law enforcement all electric zero emissions rapid response commercial scooters.
>
> **OPTEC International, Inc**., the exclusive distributor of the **OPTEC** Fuel Maximizer, will now include the **OPTEC** Zero Emissions Scooters to their exclusive USA distribution agreements.
>
> The 2019 patented electric scooter technology was recently acquired by Optimized Fuel Technologies and is currently in production at the company's Carlsbad, CA facility. The "Cadillac" of scooters have been previously purchased by southern California Law Enforcement and EMT divisions and rigorously tested and proven for over 4 years. The new OPTEC rapid response Scooter has a 40 Mile Range and 30 MPH capability on a single battery charge and is equipped with 2 Lithium Ion batteries on board giving double the range capability.
>
> **Optec International is debuting the EMT rapid response scooters at the renowned "EMS TODAY" expo in** Maryland**,** February 20-22nd **2019. Optec rapid response scooters will be exhibited at OPTEC booth # 1919.**
>
> The EMS and law enforcement networks have already shown a significant interest in acquiring the rapid response scooters to reduce emergency response times in crowded events and disaster relief areas. Optec International is projecting significant revenues in 2019 from the sale of the scooters based on current inquiries from Municipalities and agencies across the country.
>
> The tremendous growth of the Electric Micro Mobility sector has not gone unnoticed by some of the largest transportation network companies and holding companies. According to Bloomberg, Uber and Alphabet, Inc has invested $335 million into partnering with Lime, an electric scooter company and a UC Davis study now shows these new micro mobility technology markets are approaching a Trillion Dollar Market. Both Uber and Lyft also launched electric dock-less scooter rideshare programs along with FORD Motor Company's recent purchase of SPIN scooter technology for over $100M and General Motors participation in the light electric vehicles market.

> In Los Angeles, San Francisco and Sacramento the frequent and rapidly expanding use of the electric scooters is reported to have a noticeable impact on reduction of vehicle traffic congestion and at the same time helping global effects of vehicular emissions reduction."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

27. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about February 21, 2019, the Defendant published and disseminated certain statements, entitled "*OPTEC International Introduces the All-Terrain Rapid Response Scooter (RRS) at the National EMS Today Expo National Harbor, Maryland*," which provided, in pertinent part, as follows:

> "CARLSBAD, Calif., Feb. 21, 2019 /PRNewswire/ -- **OPTEC International, Inc., (OTCQB: OPTI)** today proudly announced the introduction of the OPTEC Rapid Response Scooter (RRS) at the EMS Today Expo booth # 1919 which runs from February 20th to 22nd in National Harbor, Maryland.
>
> The RRS for the past 5 years has been utilized by the First Responders (Police, FD) and the Parking enforcement agencies for the City of San Diego. During these past several years, OPTI RRV has an extensive record of reliability and durability. Along with this successful track record, OPTEC International (OPTi) was recently awarded the exclusive distribution rights for the entire USA for the RRV vehicle.
>
> With OPTI now owning the exclusive distribution rights for the USA, the Company decided to introduce the RRS national launch at the national EMS Today Expo. The EMS Today Expo is where over 4,500 paramedics, EMT's, Fire Service, Public Safety and other First Responders from around the world come for CEH opportunities and to see the most innovative products and services in the industry.
>
> OPTEC CEO, Peter Sollene, stated, "We are extremely excited about how well the Rapid Response Scooter (RRS) has been received. We were confident in the product as the First Responders for the City of San Diego have been using them for several years. Now that we received the exclusive distribution rights for America, we felt the EMS Today Expo would be a great venue to announce it to the EMT & First responders' community. What is even more exciting is currently, OPTI is expecting delivery of an additional 250 RRS vehicles between April & May 2019, which could result in an estimated revenue in excess of $2M. Overall, we are extremely excited about the future of the RRS."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

28. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about February 27, 2019, the Defendant published and disseminated certain statements, entitled "*OPTEC International Announces Voluntary Filing of Form 15 to Suspend SEC Obligations; Will Continue to Provide Financial Information and Company Updates Through Web Site and OTC*, which provided, in pertinent part, as follows:

> CARLSBAD, Calif., Feb. 27, 2019 /PRNewswire/ -- OPTEC International, Inc. (OTCQB: OPTI), today announced the filing of Form 15 with the Securities and Exchange Commission (the "SEC). OPTI filed the Form 15 with the SEC under the Securities Exchange Act of 1934, as amended (the 'Exchange Act"), to suspend its reporting obligations under Section 15(d) of the Exchange Act.
>
> Upon filing of the Form 15, OPTI's obligation to file periodic and current reports with the SEC, including Forms 10-K, 10-Q and 8-K, was immediately suspended. The Company's duty to file reports with the SEC will be terminated 90 days after filing of the Form 15. Despite the termination of registration, the Company expects that shareholders will be able to continue to trade the outstanding common shares of OPTI, and the Company intends to maintain a public listing on the OTC Pink Sheets market or other exchange as it may determine appropriate. The Company plans to continue to disclose its financial statements on a quarterly and annual basis through the OTC Markets reporting service as an alternative reporting company. The Company anticipates that its common stock will resume quoting on the OTC Markets marketplace, a centralized electronic quotation service for over-the-counter securities, so long as market makers demonstrate an interest in trading the Company's common stock. OPTI is eligible to suspend its reporting obligations because it has fewer than 300 record holders of its common shares.
>
> A Special Meeting of the majority of shareholders has approved this action primarily as a cost reduction measure. A majority of the shareholders of the Company felt that suspending and ultimately terminating the Company's SEC reporting obligations will allow it to reduce the substantial legal, accounting, and other expenses associated with reporting compliance and make those savings available for continued operation of the business.
>
> A Company Spokesperson for the Shareholders commented on the announcement with the following statement: "A majority of the shareholders of OPTI met with the Board and recommended this action to file Form 15. The recommendation to deregister was made after careful consideration of the advantages and

> disadvantages of being a public full reporting company and the increasing expense of compliance with the many SEC related requirements. This decision should result in a benefit to the Company's shareholders by reducing expenses and permitting management to focus its energies on operating and growing the company."

Upon information and belief, the Defendant's statements were an utter breach of the SPA's, Notes, and the Transaction Documents, and an extraordinary breach of trust by the Defendant against the interests of the Plaintiff, and were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

29. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about March 22, 2019, the Defendant published and disseminated certain statements, entitled "*OPTEC International Terminates Company Transfer Agent For Restrictive Legend Removal Dispute,*" which provided, in pertinent part, as follows:

> CARLSBAD, Calif., March 22, 2019 /PRNewswire/ -- OPTEC International, Inc. (OTCQB: OPTI), today announced the company recently terminated West Coast Stock Transfer as the company transfer agent due to a dispute of restrictive rule 144 legend removals by the transfer agent.
>
> On February 27th, 2019 the company filed SEC Form 15 which relieved OPTI's obligation to file periodic and current reports with the SEC, including Forms 10-K, 10-Q and 8-K commencing February 27th, 2019. This filing under rule 144 extends the holding period from a 6-month period to a 12- month period for restrictive legend removal.
>
> The termination of West Coast as the company's transfer agent became effective March 12, 2019 since then no additional unrestricted shares have been introduced in to the market.

Upon information and belief, the Defendant's statements were an utter breach of the SPA's, Notes, and the Transaction Documents, and an extraordinary breach of trust by the Defendant against the interests of the Plaintiff, and were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

30. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about April 8, 2019, the Defendant published and

disseminated certain statements, entitled "*OPTEC International Introduces Stand Alone Off-Grid Solar Powered LED Lighting Products*," which provided, in pertinent part, as follows:

> "CARLSBAD, Calif., April 8, 2019 /PRNewswire/ -- **OPTEC International, Inc.** (OTC: OPTI), today introduced the OPTEC off-grid Solar Powered LED lighting systems, with its proprietary lens technology.
>
> These Solar powered lighting systems branded "OPTIMUM LED" are complete standalone lighting solutions. The lights do not require traditional grid-based power sources and offer days of battery back-up power even during inclement weather conditions. The OPTEC proprietary patented lens technology provides major increases in the amount of light projected with major increases in lux on the ground and less glare than any competitive LED lighting offered today.
>
> A company spokesperson stated, "We are very excited to announce these Solar powered lights. One of the main reasons why we are excited is the significant cost savings to the end user. After the initial purchase of the Solar Lights and the simplistic Off-Grid installation, the ROI for the end user is typically only several months, not years, empowering the end user to have significant ongoing savings."
>
> The company is already targeting the commercial municipality lighting solutions for streetlight, school, parks along with parking lots, shopping centers and security lighting sectors. Currently, the company is already taking orders for the Solar Lighting products and expects to report significant backlog and sales for Q2 ending June 2019.
>
> In addition to the "Optimum LED", the company has simultaneously introduced an advanced Security Solar Powered LED light with integrated HD Camera technology compatible with all Bluetooth compatible smart-technology devices. This advanced technology offers a host of applications to the Security, Governmental and Military Sectors worldwide, particularly in areas where traditional power sources are not available.

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

31. As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about April 23, 2019, the Defendant published and disseminated certain statements, entitled "*OPTEC International Forms Strategic Partnership With DR Microgrids, Powered by ENERGI PROS*," which provided, in pertinent part, as follows:

> "CARLSBAD, Calif., April 23, 2019 /PRNewswire/ -- **OPTEC International, Inc.** (OTC: OPTI) forms strategic partnership with DR Microgrids, powered by ENERGI PROS™, for the inclusion of OPTEC Optimum Solar LED lighting solutions to upcoming microgrid projects.
>
> With the imminent and increasing threat of wildfires and flooding in just California alone, Public Safety Power Shutoffs (PSPS) are becoming common practice during high risk days for the prevention of disaster. This practice leaves businesses and communities without power leading to temporary closures or forcing businesses to use emission producing back up generators that require costly fossil fuel usage.
>
> DR Microgrid is a new venture for ENERGI PROS™, a leader in the energy savings/energy services industry since 1993, to expand their reach and innovation. DR Microgrid was created to protect businesses from utility's time of use increases and Public Safety Power Shutoffs (PSPS) by creating Microgrid solutions. By islanding from the grid during a power outage, microgrids avert significant economic loss.
>
> Meanwhile, the Microgrid can help the utility ease strain on the central grid during periods of peak demand hours with stored back-up power. This solution allows businesses to gain reliable, resilient, and sustainable electricity at a lower cost.
>
> DR Microgrids chose the OPTEC Optimum Off Grid Solar LED lighting solution to partner with because of the Optimum's proprietary lens technology thereby making the OPTEC LED one of the most efficient off grid LED lighting solutions on the market today.
>
> Optimum Solar LED lighting provides an outdoor lighting solution for both Public Safety Power Shutoffs and for lowering energy costs with sustainable energy. Reliable outdoor security lighting is essential for businesses for the safety of their customers and employees. Off-grid lighting ensures reliability in the case of natural disasters, planned outages, and provides security lighting to areas without access to power. Optimum Solar LED is also a solution for businesses to eliminate their outdoor energy costs while committing to using clean, sustainable energy. The partnership with microgrids and outdoor solar lighting becomes a package solution.
>
> OPTEC CEO commented, "The partnership with DR Microgrids brings great opportunities for both companies. Having a packaged solution provides businesses with added security to prevent costly business interruptions during power grid black outs, whether scheduled or incidental."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

32. Upon information and belief, Defendant OPTI made misrepresentations regarding the supposed progress of the Company, prior to and in connection with the offer, purchase and sale of securities with the Plaintiff, and as it contemplating making an investment of hundreds of thousands of dollars in the Company.

33. As a direct and proximate cause of the violations of the federal securities laws of the Defendant, Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

**C. Defendant's Events of Default and Breaches of SPA's and Notes**

34. Thereafter, the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Auctus Notes. These Events of Default included, *inter alia*, breaches of following provisions of the Auctus Transaction Documents: a) Section 1.4(h) (Failure to Deliver Common Stock); b) Section 2.8 (Non-Circumvention); c) Section 3.2 (Failure to Honor Conversion); d) Section 3.4 (Breach of Agreement and Covenants – Sections 2.8 of the note – Non-circumvention and 1.3 see above); e) Section 3.5 (Breach of Representations and Warranties – Section 3(g) (SEC Documents; Financial Statements) of the Auctus SPA); and f) Section3.16 (Replacement of Transfer Agent).

35. Thereafter, it is undisputed that the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Auctus Notes. In addition, pursuant to Section 3.1, an Event of Default shall have occurred by the failure of the Company to pay the principal or interest when due on the Note, whether at maturity, upon acceleration, or otherwise. *See* Notes (**Exhibit B**), (**Exhibit D**) and (**Exhibit F**), § 3.1. Events of Default, together with others, have occurred and continue to occur.

36. As a result of such Events of Default and the continuation of the same without cure, on or about March 18, 2019, Plaintiff Auctus delivered its Notice of Default on the June 15, 2018 Note (hereinafter the "Default Notice") to the Company. Since the delivery of the Notice of Default, the Company has failed to cure the same, which default continues to the present date.

37. Upon the occurrence of an Event of Default under Section 3.1 of the Auctus Notes, the entire principal and accrued interest shall be due and owing hereunder. Furthermore, an Event of Default pursuant to Section 3 of such Note, the Company is required to pay, and shall pay, Plaintiff Auctus the "Default Sum" (as defined therein), due under the Auctus Notes. Thus, as of August 8, 2019, the Company owes Plaintiff Auctus, under the SPAs and the Notes, the Default Sum totaling One Million – Four Hundred – Fifty – Two Thousand – Nine Hundred – Eighty – Eight and 13/100 (**$1,452,988.13)** Dollars (U.S.). *See* Default Calculations as of August 8, 2019, attached, restated and incorporated by reference herein as **Exhibits 1A, 1B & 1C**. Until paid, the Default Sum shall continue to accrue the default interest rate of Twenty-four and 00/100 (24.00%) percent per year, provided by the Notes.

## V. VIOLATIONS OF LAW

## COUNT I - VIOLATIONS OF FEDERAL SECURITIES LAWS

38. The Plaintiff reasserts Paragraphs 1 through 37 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

39. The Defendant violated Sections 12(2) and/or 17(a) of the Securities Act, 15 U.S.C §§77l(2) and/or 77q(a), in addition to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in that, as described herein, and in connection with the purchase, offer and sale of securities, they knowingly, recklessly and intentionally:

a) employed manipulative and deceptive devices and contrivances;

b) employed devices, schemes and artifices to defraud;

c) made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and

d) engaged in acts, practices and a course of business which operated as a fraud or deceit upon the Plaintiff.

40. As a direct and proximate cause of the violations of the federal securities laws by the Defendant, Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

**COUNT II - VIOLATIONS OF MASSACHUSETTS STATE SECURITIES LAWS**

41. The Plaintiff reasserts Paragraphs 1 through 40 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

42. The Defendant violated Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A, §§ 101, *et seq.*, *as amended*, in that, as described herein, it offered and sold securities by means of untrue statements of material fact.

43. The Defendant recklessly and intentionally omitted disclosure of pertinent material facts in an attempt to make its previous statements appear to not be misleading.

44. As a direct and proximate cause of the violations of the Massachusetts state securities laws by the Defendant, Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT III – BREACH OF CONTRACT

45. The Plaintiff reasserts Paragraphs 1 through 44 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

46. Pursuant to the Security Purchase Agreements and the Notes, the Fund invested in the Company and sought to become a shareholder, in good faith, to join the Company in the accomplishment of its business goals and in accordance with the standards of the business and the securities industry. The Fund contends that the Defendant breached the contract with the Plaintiff by its conduct, as described herein.

47. The Fund alleges that the Company is liable for a breach of contract and for a breach of an implied covenant of good faith and fair dealing. A breach of contract is failure without excuse to perform a duty which is due under the contract. Additionally, the interpretation of a contract is a question of law, not fact. If the wording is not ambiguous, then the contract must be enforced according to its plain terms.

48. The Plaintiff performed its obligations under the Purchase Agreements and the Notes, and in good faith.

49. The Defendant, by its conduct described herein, violated the Purchase Agreements and the Notes, breaching its contract with the Plaintiff.

50. As a direct and proximate cause of the Defendant's breaches of its contract, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT IV – BREACHES OF IMPLIED COVENANT OF GOOD FAITH-FAIR DEALING

51. The Plaintiff reasserts Paragraphs 1 through 50 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

52. It is well established in that every contract carries an implied covenant of good faith and fair dealing whereby the parties treat each other fairly and act in good faith and no party to the contract shall take any action to harm another party's rights under the contract. The duty imposed by this "implied covenant of good faith and fair dealing" pertains to bad faith in the performance of a contract, not just in its execution or negotiation. Implicit in every contract is the requirement on faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.

53. A breach of contract is the failure to perform for which legal excuse is lacking. As a matter of law, a contract existed, which the Company breached and failed to comply with the covenant of good faith and fair dealing. The law is clear - the Fund had binding contracts and the Company has no legal basis, as a matter of law, to avoid its obligations under the Notes or the damages, including but not limited to damages set forth pursuant to Section 3.10 of such Notes which arose as a result from the breach of the Purchase Agreements and the Notes.

54. The Defendant had a duty of good faith and fair dealing in its dealings with the Plaintiff and pursuant to the promises, contracts, and statements made to the Plaintiff to induce it to enter into the contracts and provide assets to the Defendant in exchange for its promise to repay the same, with interest.

55. Under the covenant, the Defendant was obligated to a good faith performance of its obligations under the Purchase Agreements and the Notes with the Plaintiff, and to be faithful and consistent to the justified expectations of the Plaintiff.

56. As described above, the Defendant breached the implied covenant of good faith and fair dealing with the Plaintiff.

57. As a direct and proximate cause of the Defendant's breaches of the implied covenant of good faith and fair dealing, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

**COUNT V – UNJUST ENRICHMENT**

58. The Plaintiff reasserts Paragraphs 1 through 57 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

59. The Defendant illegally received assets and benefits from the Plaintiff, as arising from its false and fraudulent statements and misrepresentations, and without providing equivalent value therefor.

60. The Defendant's actions, courses of conduct, and omissions were wantonly, intentionally, and maliciously conducted against the Plaintiff, to its detriment.

61. The Defendant has been unjustly enriched by its actions, as described herein.

62. As a direct and proximate cause of the Defendant's unjust enrichment, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

**COUNT VI – BREACH OF FIDUCIARY DUTY**

63. The Plaintiff reasserts Paragraphs 1 through 62 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

64. A fiduciary relationship existed between the Plaintiff and the Defendant, requiring it to act with a duty of the utmost loyalty and trust on behalf of the Plaintiff. As a fiduciary, the Defendant was required to maintain and protect the welfare of the Plaintiff.

65. By engaging in the conduct described herein, the Defendant breached its fiduciary duties to the Plaintiff.

66. As a direct and proximate cause of the Defendant's breach of fiduciary duty, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

**COUNT VII – FRAUD AND DECEIT**

67. The Plaintiff reasserts Paragraphs 1 through 66 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

68. The actions of the Defendant described herein constitute fraud and deceit, including but not limited to the following:

a) the Defendant made false representations of material facts, and/or omitted material facts with a duty of disclosure, knowing or having reason to know of their falsity;

b) the Defendant made said misrepresentations and omissions for the purpose of inducing reliance from the Plaintiff; and

c) the Plaintiff did rely upon said misrepresentations and omissions, to its detriment.

69. As a direct and proximate cause of the Defendant's fraud and deceit, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

**COUNT VIII - NEGLIGENT MISREPRESENTATION**

70. The Plaintiff reasserts Paragraphs 1 through 71 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

71. The conduct of the Defendant as described herein constitutes negligent misrepresentation in that the Defendant negligently provided the Plaintiff with erroneous and misleading information, and negligently omitted material information with a duty to disclose, to the Plaintiff's detriment.

72. As a direct and proximate cause of the Defendant's negligent misrepresentations, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

**COUNT IX - VIOLATIONS OF MASSACHUSETTS CONSUMER PROTECTION ACT / M.G.L. C. 93A, §§ 2 & 11**

73. The Plaintiff reasserts Paragraphs 1 through 72 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

74. At all relevant times herein, the Defendant conducted a trade or business, as defined by the Massachusetts Consumer Protection Act, M.G.L. c. 93A, within the Commonwealth of Massachusetts.

75. The conduct of the Defendant as described herein, constitutes unfair and deceptive trade practices, under Sections 2 and 11 of the Consumer Protection Act, including but not limited to claims that the Defendant:

a) executed the Securities Purchase Agreements and the Notes with full knowledge and understanding of the Defendant's obligations to the Plaintiff;

b) fraudulently induced the Plaintiff to invest in the Company and thereby breached its promise to repay the Plaintiff;

c) fraudulently concealed from the Plaintiff the full and complete financial and operational details and prospects of the Company in inducing the Plaintiff to make its investment in the Company;

d) knowingly and intentionally concealed these activities from the Plaintiff, to its detriment; and/or

e) violated the requirements, terms and conditions of existing statutes, rules and regulations meant for the protection of the public's health, safety or welfare.

76. As a direct and proximate cause of the Defendant's violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, Sections 2 and 11, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## VI. REQUESTS FOR RELIEF

WHEREFORE, the Plaintiff, Auctus Fund, LLC, respectfully request that this Honorable Court grant it the following relief:

A) Order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, and specific performance, and finding that the Plaintiff has suffered irreparable harm, has a likelihood of success on the merits, that the balance of hardships favors the Plaintiff and that it is in the public interest to grant such temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiff, as set forth herein;

B) Determine that the Defendant is liable for all damages, losses, and costs, as alleged herein;

C) Determine and award the Plaintiff, Auctus Fund, LLC, the actual losses sustained by it as a result of the violations of law by the Defendant, as set forth herein;

D) Render a judgment and decision on behalf of the Plaintiff, Auctus Fund, LLC, on all Counts of the Complaint, and issue findings of fact and rulings of law, as necessary and appropriate, that the Defendant is liable, in all respects;

E) Order, decide, adjudge, and determine that the liability of the Defendant, is for all losses, injuries, and damages, special, consequential, general, punitive, and/or otherwise, and for all interest and costs, as alleged herein;

F) Award the Plaintiff, Auctus Fund, LLC, its costs, including, but not limited to, filing fees, costs, expenses and interest, for being required to prosecute this action;

G) Award the Plaintiff, Auctus Fund, LLC, its actual attorneys' fees, for being required to prosecute this action;

H) Award the Plaintiff, Auctus Fund, LLC, multiple, double, treble, and/or punitive damages in an amount to be determined;

I) Enter judgment on behalf of the Plaintiff, Auctus Fund, LLC, on the Complaint;

J) Order declaratory relief, as appropriate and as this Honorable Court deems necessary; and/or

K) Any additional relief which this Honorable Court deems just and proper.

**THE PLAINTIFF, AUCTUS FUND, LLC,**
**<u>DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE</u>**

Respectfully Submitted,
PLAINTIFF, Auctus Fund LLC,

By its Attorneys,

/s/ *Philip M. Giordano*

Philip M. Giordano, Esq. (BBO No. 193530)
Sophia E. Kyziridis, Esq. (BBO No. 703590)
Giordano & Company, P.C.
REED & GIORDANO, P.A.
47 Winter Street, Suite 800
Boston, Massachusetts 02108-4774
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email: pgiordano@reedgiordano.com
Email: skyziridis@reedgiordano.com

Dated: August 14, 2019